# UNITED STATES DISTRICT COURT

_____DISTRICT OF MASSACHUSETTS_____

UNITED STATES OF AMERICA

v.

RICHARD VIKTOR RICHARDSON BALLESTER

**CRIMINAL COMPLAINT**

CASE NUMBER: 04-M0002-LPC

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about ___March 17, 2004___ in ___Suffolk___ County, in the District of ___Massachusetts___ defendant(s) did, (Track Statutory Language of Offense)

Knowingly, willfully and intentionally import into the customs territory of the United States from a place outside thereof a quantity of cocaine, a Schedule II controlled substance, and a quantity of heroin, a Schedule I controlled substance

in violation of Title ___21___ United States Code, Section(s) ___952(a) and 960___

I further state that I am a(n) ___Special Agent, U.S. Bureau of Immigration and Customs Enforcement___ and that this complaint is based on the following facts:                                                        Official Title

See attached Affidavit.

Continued on the attached sheet and made a part hereof:   X Yes   ☐ No

_____
Signature of Complainant
Special Agent Matthew Gilmore

Sworn to before me and subscribed in my presence,

March 18, 2004                                at        Boston, Massachusetts
Date                                                   City and State

LAWRENCE P. COHEN
United States Magistrate Judge                    _____
Name and Title of Judicial Officer                 Signature of Judicial Officer

## AFFIDAVIT OF SPECIAL AGENT MATTHEW GILMORE

I, Special Agent Matthew Gilmore, do hereby depose and state as follows:

1. I am a Special Agent with the United States Bureau of Immigration and Customs Enforcement ("ICE"). I have been so employed for approximately the past twenty-three months. After completing my basic training, I was assigned to the Strategic Investigations group, focusing on export violations, and since December, 2003 I have been assigned to the Narcotics Smuggling group of the ICE Boston office. During that time, I have been involved in approximately a dozen investigations involving the illegal smuggling of ecstasy, cocaine, heroin and marijuana. I have received training from ICE at the Federal Law Enforcement Training Center in all aspects of drug smuggling, including the structure, organization and operation of international drug smuggling groups, the techniques used by such persons to finance and import drugs, the identification of documents and other records commonly generated by such operations and the methods used by persons to smuggle drugs into the United States either on their persons or in their luggage.

2. I submit this affidavit in support of a criminal complaint charging RICHARD VIKTOR RICHARDSON BALLESTER ("BALLESTER") with illegally importing into the customs territory of the United States from a place outside thereof a quantity of

1

cocaine, a Schedule II controlled substance, and a quantity of heroin, a Schedule I controlled substance, in violation of 21 U.S.C. §§ 952(a) and 960.

3. I know the following information to be true and accurate based upon information I have learned first hand during the course of this investigation, as well as upon information provided to me in the course of my duties by other ICE agents and inspectors of the Customs and Border Protection Bureau ("CBP"). In light of the limited purposes for which this affidavit is being submitted, I have not included each and every fact known to me or to other ICE agents and inspectors concerning the government's investigation in this matter.

4. On Wednesday, March 17, 2004, at approximately 9:00 p.m., American Airlines flight No. 2084 arrived at Logan International Airport from Santo Domingo, Dominican Republic. BALLESTER, a Dominican citizen, was a passenger on that flight and exited the plane along with the other passengers at Terminal E.

5. BALLESTER was the last person from that flight to enter the customs inspection area. BALLESTER, who had a suitcase as his only piece of luggage, was asked routine questions by CBP inspectors and, for instance, indicated that the contents of his suitcase belonged to him and that he had packed the suitcase. When his suitcase was opened, CBP inspectors detected a strong odor of glue and observed what appeared to be relatively fresh glue along

the bottom edges of the suitcase. As the inspection of his suitcase occurred, CBP inspectors noticed that BALLESTER appeared to be nervous, began stuttering and asked for a drink of water. Inspectors removed the contents of his suitcase and their further inspection made them suspect that the suitcase had been altered and might contain a concealed compartment.

6. At that point, inspectors took BALLESTER's suitcase to be X-rayed and that process revealed the presence of objects within an enclosed portion of the suitcase. Inspectors then took the suitcase apart and confirmed that it had a false bottom containing three plastic packages held together with brown tape.

7. At this point, BALLESTER was escorted into an interview room where, before anyone had mentioned what had been discovered in his suitcase, BALLESTER volunteered words to the effect that he did not have any drugs. Meanwhile, in another room, the packages from his suitcase were opened and their contents field-tested. The contents of two of the packages field-tested positive for the presence of cocaine and the contents of the third package field-tested positive for the presence of heroin. The cocaine packages had an approximate gross weight of 1,095 grams and 1,075 grams, respectively. The heroin package had an approximate gross weight of 1,165 grams. At this time, the inspector summoned an ICE agent, who reported to the scene along with myself and a third agent.

8. Special Agents Peter Darling and Eric LaForte were the

first to arrive at the terminal and read BALLESTER (who understood and spoke English) his Miranda rights. BALLESTER agreed to speak with the agents and signed a written waiver of his Miranda rights. Special Agent Darling conducted an initial interview of BALLESTER beginning at approximately 11:45 p.m., during which an inspector took notes. I arrived at approximately midnight and was present throughout a second interview of BALLESTER by Special Agent Darling during which I took notes. That second interview lasted until approximately 12:40 p.m..

9. In both interviews, BALLESTER indicated that he lives in Santo Domingo, where approximately one week ago he was approached by two individuals, Jose and Angelito, who asked him if he wanted to take a trip to Boston, Massachusetts and do some business with them by delivering passports and birth certificates to an individual in the Boston area. They offered to pay for his airfare and to put him up in somebody's house in Massachusetts, where he would stay for approximately two weeks, and he would receive approximately two thousand dollars for his efforts.

10. On Monday, March 15, 2004, BALLESTER indicated that he saw Jose and Angelito again and they said they needed to speak with him about "business." They met the next day, Tuesday, March 16, 2004, at which time Jose and Angelito indicated that they needed somebody they could trust. According to BALLESTER, he asked why he needed to make this trip and they reiterated that they needed him

4

to deliver some passports, birth certificates and clothing to the Boston area. BALLESTER claimed that he indicated that he wanted to see the contents of the suitcase he would be carrying because he was a little suspicious of what it might contain.

11. BALLESTER went on to say that Jose and Angelito contacted him again on Wednesday, March 17, 204 and asked him if was willing to make the trip that day. BALLESTER agreed but, according to him, they then discovered that his passport had expired. Accordingly, over the next few hours, Jose helped BALLESTER run around the city getting his passport renewed. By the time they were done, according to BALLESTER, they had to get to the airport and the suitcase he would carry onto the plane was already packed into the car in which he was driven to the airport. Nevertheless, according to BALLESTER, he had an opportunity to open the suitcase, saw that the suitcase contained some clothing and added some clothing and/or personal effects of his own before closing the suitcase.

12. According to BALLESTER, he told Jose that if anything happened to BALLESTER, he, BALLESTER, would direct the authorities to Jose and specifically told Jose that, if the suitcase turned out to contain drugs and BALLESTER were caught, BALLESTER would tell the authorities about Jose. According to BALLESTER, Jose and Angelito assured him that the suitcase did not contain controlled substances.

13. On the one hand, BALLESTER reported that he had known Jose and Alito since childhood and that he trusted them, although he now felt betrayed by them. On the other hand, BALLESTER claimed not to know the last name of either Jose or Alito, even though he had known them for so many years.[1]

14. On the morning of Thursday, March 18, 2004, BALLESTER was transported to the federal courthouse in Boston by two other ICE Special Agents. BALLESTER was asked if he had been read his Miranda rights and indicated that he had been. During the course of the trip to the courthouse, BALLESTER indicated that he was to have been paid five hundred dollars for making this trip, as opposed to the two thousand dollars he had reported during the course of both interviews the night before. After arriving in the U.S. Marshal's lock-up area in the federal courthouse, BALLESTER also indicated that Angelito's father was a corrupt police or immigration official in the Dominican Republic and had some illicit arrangement with an American Airlines employee.

15. Based on the foregoing information, I believe there is probable cause to believe that RICHARD VIKTOR RICHARDSON BALLESTER has committed a violation of 21 U.S.C. §§ 952(a) and 960, the illegal importation of cocaine, a Schedule II controlled substance,

---

[1] In a late morning interview on March 18, 2004, BALLESTER indicated that he had known Angelito since childhood, but met Jose for the first time just one week ago. He still claimed not to know Angelito's last name.

6

and of heroin, a Schedule I controlled substance, into the United States from a place outside thereof, namely the Dominican Republic.

_____
MATTHEW GILMORE
Special Agent
U.S. Bureau of Immigration
and Customs Enforcement

Sworn to and subscribed before me this 18th day of March, 2004.

_____
LAWRENCE P. COHEN
United States Magistrate Judge