UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| RICHARD VIKTOR RICHARDSON | ) Criminal No.   04-10124-RGS |
| BALLESTER, | ) |
| | ) |
| Defendant. | ) |

### GOVERNMENT'S OPPOSITION TO DEFENDANT'S
### MOTIONS TO SUPPRESS

#### Introduction

The United States of America, by and through the undersigned counsel, hereby submits its opposition to defendant's "Motion to Suppress Statements and Physical Evidence." On Wednesday, March 17, 2004, Richard Viktor Richardson Ballester ("Ballester"), a Dominican citizen, was arrested at Logan International Airport for illegally importing into the United States two kilograms of cocaine and one kilogram of heroin hidden within a hidden compartment inside his suitcase. Ballester urges this Court to suppress incriminating statements made by him in English on the night of his arrest at the airport to customs agents after he had waived his Miranda rights orally and in writing together with incriminating statements made by him in English the next day at the federal courthouse to customs agents and a federal prosecutor after he again orally had waived his Miranda rights.

The defendant's motion to suppress must fail because Ballester's waiver of his rights was made voluntarily, knowingly

2

and intelligently. He was not subjected to any coercion, threats or intimidation by law enforcement officials, nor was he worn down by improper interrogation tactics or lengthy interviews. Moreover, Ballester's command of English was more than sufficient to allow him to understand what the agents said to him and to communicate effectively in English with the agents, rendering his waiver both knowing and intelligent.

## Factual Background

On Wednesday, March 17, 2004, at approximately 9:00 p.m., American Airlines flight No. 2084 arrived at Logan International Airport from Santo Domingo, Dominican Republic. See Affidavit of Special Agent Matthew Gilmore submitted in support of the government's application for a Complaint ("Complaint Affidavit" of "Complaint Aff.") a copy of which is attached hereto as Exhibit 1, para. 4. Ballester, a Dominican citizen, had filled out a customs declaration form in English and was the last passenger from that flight to enter the customs inspection area. See copy of Customs Form attached hereto as Exhibit 2; and Complaint Aff., paras. 4-5.

As more fully described in the Complaint Affidavit, Ballester went through a primary and secondary customs screening process, whereupon two packages of cocaine and one package of heroin were discovered in a false compartment in Ballester's suitcase. Complaint Aff. at paras. 5-7. Customs officials had readily available to them interpreters or Spanish-speaking personnel had

3

Ballester, or anyone else from the same flight, indicated the need for one.    See Affidavit of Senior Special Agent Peter Darling submitted in support of the Government's Opposition ("Darling Aff."), the original of which is attached hereto as Exhibit 3, at para. 4. However, at no time during either the primary or secondary inspection process did Ballester request an interpreter or indicate that he did not speak or understand English well enough to communicate with customs personnel. Darling Aff. at paras. 5 and 8. It was only after the drugs had been discovered in Ballester's suitcase that Immigration and Customs Enforcement agents were summoned to the scene. Complaint Aff. at para. 7. Senior Special Agent Peter Darling and Special Agent Eric LaForte were the first to arrive, followed sometime later by Special Agent Matthew Gilmore. Complaint Aff. at 8. Senior Special Agent Darling and Special Agent LaForte confirmed that Ballester understood and spoke English and read to Ballester his Miranda rights. Id. Ballester agreed to speak with the agents and signed a written waiver of his Miranda rights. Id.; and copy of Miranda waiver form signed by the defendant, a copy of which is attached hereto as Exhibit 4. Once again, Ballester did not request an interpreter or indicate to the agents that he did not speak or understand English well enough to communicate with them. Darling Aff. at paras. 6-8.

Whereas Ballester tries to suggest that he was subjected to

4

custodial interrogation for nearly four hours from the moment his flight landed,[1] in fact it was not until approximately 11:45 p.m. that Senior Special Agent Darling began interviewing Ballester, accompanied by Customs Inspector Daniel Hurley, who took notes. Complaint Aff. at para. 8.  Special Agent Gilmore arrived sometime during that first interview, after which a second interview occurred which ended by approximately 12:40 a.m. (less than an hour after the first interview had begun), during which Special Agent Gilmore (who later authored the Report of Investigation) took notes.  Id.  At no time during these two interviews conducted at the airport did Ballester request an interpreter or indicate that he did not speak or understand English well enough to communicate with the agents.  Darling Aff. at para. 8.  During these initial interviews, and as more fully set forth in the Complaint Affidavit, Ballester gave a detailed account in English of his involvement with the suitcase containing the drugs, in the course of which he made incriminating statements which he now seeks to suppress. Complaint Aff. at paras. 9-13.

The morning after his arrest, on March 18, 2004, Ballester was transported  by two other ICE agents to the federal courthouse for his initial appearance.  Complaint Aff. at para. 14.  The agents

---

[1]    In his motion papers, Ballester indicates that "federal agents stopped" him at the airport at about 9:00 p.m., "took him into custody and escorted him to a private room for questioning" and that he "remained there until about 12:40 a.m. being questioned by federal agents."  Motion to Suppress at 1-2.

5

confirmed with Ballester that he had been read his Miranda rights
and, during the ride to the courthouse, Ballester indicated that he
was willing to make a consensually recorded call to persons in
Massachusetts with whom he was supposed to have made contact at the
airport.  Complaint Aff. at para. 14; and Darling Aff. at para. 9.
In order to determine what, if anything, could be achieved by such
a telephone call and, if appropriate, to make such a consensually
recorded call, Ballester was taken from the marshal's lock-up to a
conference room in the U.S. Attorney's Office prior to his mid-
afternoon initial appearance.  Darling Aff. at para. 9.     In the
presence of ICE Special Agent John Coleman, Special Agent Matthew
Gilmore, Task Force Agent Michael Feeney and Assistant U.S.
Attorney Patrick Hamilton, Ballester again was advised of his
Miranda rights and again indicated that he understood them.  During
the course of the morning of March 18, 2004, Ballester made more
incriminating statements which he now seeks to suppress.  At no
time during the ride to the courthouse, during the booking process
in the marshal's lock-up, or during the meeting in the U.S.
Attorney's Office did Ballester ever indicate that he needed an
interpreter or that he did not speak or understand English well
enough to communicate in that language.  Darling Aff. at para. 10.

## Argument

A waiver of a defendant's constitutionally guaranteed Fifth
Amendment privilege against self-incrimination is valid if it is

6

made voluntarily, knowingly, and intelligently.     <u>Miranda v.</u>
<u>Arizona</u>, 384 U.S. 436, 445 (1966). It requires proof of two
elements: (1) the relinquishment of the right must have been
voluntary in the sense that it was the product of a free and
deliberate choice rather than intimidation, coercion, or deception;
and (2) the waiver must have been made with a full awareness of
both the nature of the right being abandoned and the consequences
of the decision to abandon it. <u>Moran v. Burbine</u>, 475 U.S. 412, 421
(1986); <u>Fare v. Michael C.</u>, 442 U.S. 707, 726-27 (1979). If the
totality of the circumstances surrounding the interrogation reveal
both an uncoerced choice and the requisite level of comprehension,
a court may be confident that a defendant's <u>Miranda</u> rights have
been waived.   <u>Moran</u>, 475 U.S. at 421; <u>Fare</u>, 442 U.S. at 725.[2]

## A.   Ballester's Waiver of his Fifth Amendment Right Against Self-incrimination Was Made Voluntarily:

Ballester's motion to suppress should be denied because the
waiver of his Fifth Amendment right against self-incrimination was
voluntary.  When assessing the voluntariness of a waiver, both the
Supreme Court and the First Circuit Court of Appeals look closely
at "the type and length of questioning, the defendant's physical
and  mental  capabilities, and the government's method of

---

[2]  Ballester's motion is entitled "Motion to Suppress
Statements and Physical Evidence," but his motion papers neither
identify nor discuss the "physical evidence" he seeks to
suppress.   Therefore, the government's legal analysis focuses on
the oral statements Ballester seeks to suppress.

interrogation."   Colorado v. Connelly, 479 U.S. 157, 164 (1986);
United States v. Browne, 891 F.2d 389, 393 (1st Cir. 1989).
Moreover, the courts specifically consider whether the police
"overreached" in their interrogation by threatening or intimidating
the defendant, making direct or implied promises in exchange for a
confession, or wearing down the defendant by improper interrogation
tactics.   See United States v. Jackson, 918 F.2d 236, 241-42 (1st
Cir. 1990).

     For example, the First Circuit determined in United States v.
Duarte, 160 F.3d 80, 82 (1st Cir. 1998), that the defendant had
voluntarily waived his Fifth Amendment rights.   There, the
defendant had been arrested after throwing two firearms from the
window of his car and had been given a Miranda warning while being
transported to the police station and again just before the booking
process had commenced.   Id. at 81.   The defendant later sought
unsuccessfully to suppress his response to booking questions,
claiming that the booking procedure created an "inherently coercive
environment" that rendered his statements involuntary.   The First
Circuit ruled that

> [w]here, as here, the coercion inherent in custodial
> interrogation is dissipated by proper administration of
> the [Miranda] warnings, . . . a defendant challenging
> admission of statements made subsequent to the warnings
> must point to evidence tending to show that his
> statements nonetheless were "coerced, compelled or
> involuntary."

Id. (footnote and citations omitted).   Since the defendant had

8

offered no facts suggesting that the booking procedures had been unusual or that pressure of any sort had been used to elicit responses to the booking questions, the Court of Appeals found that the claim of a Fifth Amendment violation was without merit. Id. at 82.

Similarly, the Second Circuit Court of Appeals found a voluntary waiver of Fifth Amendment rights in United States v. Campaneria, 891 F.2d 1014, 1020 (2nd Cir. 1989). There, the defendant, a twenty-three year old emigrant from Cuba, was arrested on suspicion of committing murder. Id. at 1016, 1017. On the way to the hospital to be treated for a stab wound and again at the hospital, the defendant was read the Miranda warning in English and answered questions in "broken yet understandable English, sometimes lapsing into Spanish." Id. After being convicted of manslaughter in state court, the defendant collaterally challenged his conviction in federal court, claiming that he had not voluntarily waived his right against self-incrimination. 891 F.2d at 1018-19. The Second Circuit concluded that the defendant's Miranda waiver to have been voluntary after finding that

[t]he conduct of [the defendant's] questioners was not coercive or overbearing. Although he suffered pain and discomfort, it was not so severe as to render him unable to make a voluntary statement or unduly susceptible to manipulation by his interrogators.

891 F.2d at 1020.

In the case at bar, Ballester was administered a proper

<u>Miranda</u> warning prior to being interviewed,[3] and there is no evidence of any effort to intimidate, threaten, coerce or compel Ballester into waiving his constitutional rights. Ballester himself does not even make any such allegation in the affidavit he submitted in support of his suppression motion ("Def. Aff."). He claims "I was afraid" (Def. Aff. at para. 4), but alleges no improper conduct on the part of the Customs agents or any customs officials and presumably relies only on the inherently intimidating nature of custodial interrogation to support his conclusory statement to the effect that he did not "volutarily waive [his] rights" (Def. Aff. at para. 9). However, as noted earlier, "the coercion inherent in custodial interrogation is dissipated by proper administration of the [<u>Miranda</u>] warnings," <u>Duarte</u>, 160 F3.d at 81 (citation to <u>Miranda</u> omitted). Consequently, Ballester's waiver of his right against self-incrimination was voluntary, and the defendant's motion to suppress should be denied.

---

[3] The government understands that Ballester is **not** moving to suppress his responses to the limited questions put to him by customs officials during the inspection process, since he was not entitled to any <u>Miranda</u> warnings and could not have refused to answer their questions. <u>United States v. Pratt</u>, 645 F.2d 89, 90 (1st Cir. 1981)(law enforcement officials are not required to give Miranda warnings to everyone they question and "[t]his admonition has special application to airport customs inspections, where individuals approach official inquiry knowing of its greater necessity and routine")(citing <u>Delaware v. Prouse</u>, 440 U.S. 648, 657 (1979) (psychological impact of official intrusion lessened when "all are subjected to a show of the police power of the community")).

10

## B.    Ballester's Waiver of his Fifth Amendment Right Against Self-incrimination Was Made Knowingly and Intelligently:

Ballester's motion to suppress his statements should be denied
since he knowingly and intelligently waived his right against self-
incrimination.  When assessing whether such a  waiver was made
knowingly and intelligently, the courts consider a defendant's
personal characteristics (such as age, prior criminal justice
experience, linguistic ability, education and  intelligence) as
well as the defendant's conduct during questioning.  See Fare, 442
U.S. at 725; United States v. Heredia-Fernandez, 756 F.2d 1412,
1415 (9th Cir. 1985); United States v. Melanson, 691 F.2d 579, 588
(1st Cir. 1981).

In addition to alleging that he had never before been arrested
or questioned by "police" before, Ballester points to his age (22
at the time) and the fact that Spanish is his "primary language" in
support of his suppression motion.  Def. Aff. at paras. 2 and 6.
However, the courts have clearly ruled that youth itself is no bar
to a knowing and intelligent waiver of one's Fifth Amendment
rights.

In United States v. Bernard, 795 F.2d 749, 751 (9th Cir.
1986), the Ninth Circuit Court of Appeals considered a seventeen-
year-old juvenile with a limited knowledge of English who had been
questioned by police regarding his involvement in an altercation
that had occurred on an Apache Indian Reservation.  The defendant
appealed his assault conviction, challenging the trial court's

11

finding that he knowingly had waived his <u>Miranda</u> rights.  <u>Id.</u> at
752.  The Ninth Circuit determined that the waiver was valid
despite the defendant's youth and language difficulties.  <u>Id.</u>  The
record indicated that the police officer read and explained the
defendant's rights to him individually.  <u>Id.</u>  He answered the
police officer's questions in English, and at no time indicated
that he did not understand what was being said to him.  <u>Id.</u>
Finally, the defendant signed a written waiver of his    <u>Miranda</u>
rights.  <u>Id.</u> at 753.  In the case at bar, while Ballester is
relatively young, he was five years older than the juvenile
defendant in <u>Bernard</u> who was found to have knowingly and
intelligently waived his Fifth Amendment rights based on conduct
very similar to Ballester's.

Similarly, a defendant who has only a partial command of the
English language can still be found to have knowingly and
intelligently waived his <u>Miranda</u> rights.  For example, in
<u>Campaneria</u>, <u>supra</u>, the Second Circuit not only found that the
twenty-three-year-old defendant from Cuba had voluntarily waived
his right against self-incrimination, but the Second Circuit also
concluded that the waiver was made knowingly and intelligently.
891 F.2d at 1020.  The court determined that, "although [the
defendant] spoke in broken English with an accent and occasionally
lapsed into Spanish, his command of English was sufficient for him
to have understood the <u>Miranda</u> warnings given to him."  <u>Id.</u>  <u>See</u>

also <u>United States v. Contreras</u>, 372 F.3d 974, 978-79 (8th Cir. 2004) (finding that an 18-year old Hispanic defendant, who allegedly had difficulties with English, voluntarily and knowingly had waived his <u>Miranda</u> rights); <u>United States v. Jaswal</u>, 47 F.3d 539, 542 (2nd Cir. 1995) (finding that the defendant's waiver was voluntarily and knowingly made despite the fact that the defendant had only a "reasonably good command of the English language"); and <u>Bernard</u>, 795 F.2d at 752-53 (finding a knowing and intelligent by a seventeen-year-old defendant with language difficulties).

In this context, there are two ways in which Ballester's affidavit submitted in support of his suppression motion is very significant -- both in what it says and in what it does not say. In the first place, in his affidavit, which he admits "was prepared with the help of my attorney," Ballester states "my primary language is Spanish" -- apparently acknowledging, given the context of his affidavit, that English is his second language. Def. Aff. at paras. 2 and 12. Perhaps even more importantly, **nowhere in his affidavit does Ballester state that he did not understand what the agents were telling or asking him.[4]** In short, Ballester's ability to comprehend and speak English did not prevent

---

[4] In the affidavit prepared with the help of his very able attorney, Ballester claims "I did not *fully* understand my rights." Def. Aff. at para. 8 (emphasis added). The government understands this to mean that Ballester now claims not to have fully appreciated the legal implications of his oral and written waiver of his <u>Miranda</u> rights, not that he did not understand what the agents were saying to him.

13

him  from  making a knowing and intelligent waiver of his
constitutional  rights.  Moreover, Ballester's conduct during
questioning, like that of the defendants in the cases cited above,
confirms that his waiver was in fact knowing and intelligent.
During the course of three interviews (two on the night of his
arrest at the airport and a third the next day at the courthouse),
Ballester gave a fairly detailed account in English of his
involvement with the suitcase in which the drugs were found.  He
never indicated any difficulty in understanding or speaking English
during those interviews, nor did he request an interpreter.

Consequently, Ballester's waiver of his Fifth Amendment rights
was in fact made knowingly and intelligently.

## Conclusion

For all the foregoing reasons, the government respectfully
submits that this Honorable Court should deny defendant's
suppression motion.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:

PATRICK M. HAMILTON
Assistant U.S. Attorney
(617) 748-3251

On the brief:
Ian R. McConnel
Boston College Law School, expected J.D. 2006

14

## CERTIFICATE OF SERVICE

I, Patrick M. Hamilton, do hereby certify that I have caused a copy of the foregoing to be served by postage-prepaid first class mail delivery, upon counsel for Richard Viktor Richardson Ballester.

Date:       August 18, 2004

PATRICK M. HAMILTON
Assistant U.S. Attorney